**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ JAN 06 2012 ★

LONG ISLAND OFFICE



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
KEVIN MURRAY,

Plaintiff,

-against-

TOWN OF NORTH HEMPSTEAD, TOWN OF
NORTH HEMPSTEAD DEPARTMENT OF
BUILDINGS, TOWN OF NORTH
HEMPSTEAD DEPARTMENT OF FINANCE,
TOWN OF NORTH HEMPSTEAD TOWN
ATTORNEY OFFICE, TOWN OF NORTH
HEMPSTEAD TOWN BOARD, JO-ANNE
TAORMINA, ROBERT TROIANO, THOMAS
K. DWYER, ANGELO P. FERRARA, MARIA
CHRISTINA POONS, LEE R. SEAMAN,
FRED L. POLLACK, JON KAIMAN, and
RICHARD FINKEL, ESQ.,

Defendants.
----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
09-cv-4120 (ADS)(ARL)

**APPEARANCES:**

**The Scher Law Firm, LLP**
*Attorneys for the Plaintiff*
One Old Country Road
Suite 385
Carle Place, NY 11514
      By:    Austin R. Graff, Esq., of Counsel

**Cuomo LLC**
*Attorneys for the Defendants*
200 Old Country Road
Suite 2 South
Mineola, NY 11501
      By:    Oscar Michelen, Esq.
              Sherri Anne Jayson, Esq., of Counsel

**SPATT, District Judge.**

The Plaintiff in this case, Kevin Murray ("Murray" or the "Plaintiff") commenced this action on September 24, 2009, against the Defendants the Town of North Hempstead (the "Town"), the Town of North Hempstead Department of Buildings (the "Department"), the Town of North Hempstead Department of Finance (the "Department of Finance"), the Town of North Hempstead Town Attorney Office (the "Attorney Office"), and the Town of North Hempstead Town Board (the "Board") (collectively the "municipal Defendants"), as well as against the individually named Defendants Joanne Taormina (the Commissioner of the Department of Finance), Jon Kaiman (the Defendant Town Supervisor), Richard Finkel, Esq. (the Town Attorney), and six Councilmen and Councilwomen on the Defendant Board: Robert Troiano, Thomas K. Dwyer, Angelo P. Ferrera, Maria Christina Poons, Lee R. Seaman, and Fred L. Pollack (collectively the "individual Defendants"). Murray asserts causes of action pursuant to 42 U.S.C. § 1983, based upon allegations that the Defendants retaliated against him for the assertion of his First Amendment right to freedom of speech.

The Plaintiff and the Defendants have now cross-moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56(c). In addition, the Defendants have filed a motion for sanctions pursuant to Fed. R. Civ. P. ("Rule 11") against the Plaintiff's attorney, Austin R. Graff, Esq. For the reasons set forth below, the Court denies the Plaintiff's motion for summary judgment but grants the Defendants' motion for summary judgment in its entirety. In addition,

the Court denies the Defendants' motion for Rule 11 sanctions against the Plaintiff's counsel, Austin R. Graff, Esq.

## I. BACKGROUND

### A. Factual Background

#### 1. Employment History

##### a. Observations of Alleged Corruption

The Plaintiff commenced his employment with the Defendant Town on August 22, 2001 as a plumbing inspector with the Department. (Plaintiff's Local Rule 56.1(a) Statement ("Pl. 56.1") at ¶ 25.) In the Complaint, the Plaintiff alleges that over the course of his eight years of employment working for the Department, he observed several instances of alleged "corruption" that were disregarded by the Defendants.

First, the Complaint states that in 2003, the Plaintiff observed that the work of a plumbing contractor named Daniel Weintraub did not conform to the Defendant Town's regulatory standards that were enforced by the Department. Murray claims he raised Weintraub's non-conforming work with the Department, but that his complaint was ignored. (Complaint ("Compl.") at ¶ 25.) According to the Plaintiff, when Weintraub learned of the Plaintiff's complaints, he falsely accused the Plaintiff of soliciting bribes from him. (Compl. at ¶ 27.) A formal investigation was never conducted, although the Plaintiff requested the Department's Commissioner, David Wasserman, to do so. Moreover, the Plaintiff alleges that Wasserman told him that if he went to the Town attorney about Weintraub's work he was going to get fired because "Nothing goes across the street

[to the Defendant Attorney Office]. We handle the stuff over here." (Compl. at ¶ 31-32.) Weintraub was never disciplined regarding his non-compliance with applicable regulations. (Compl. at ¶ 33-36.)

Second, Murray alleges that in or about 2005, he was accused by Ron Dean, a general contractor, for charging $50.00 to perform a plumbing inspection, which is not permitted by law. (Compl. at ¶ 40-41.) Once again, the Plaintiff alleges that a formal investigation was never conducted, even though the Plaintiff requested Wasserman to do so. (Compl. at ¶ 46.) As a result of Dean's allegation, the Plaintiff contends that he was transferred to a different department and the stress of the ordeal caused him to develop shingles. However, after an outside company admitted to charging the fee and not Murray, he was returned to his usual position as a plumbing inspector. (Compl. at ¶ 51.)

Third, Murray alleges that in or about 2003 or 2004, the Plaintiff and four other inspectors examined the Maharaji Supermarket for the Town and discovered numerous violations of the Defendant Town's Building Code. Murray claims that during the inspection, his supervisors at the Department of Buildings told the Plaintiff "not to issue any notice of violations of the Defendant Town's Building Code to the Majaraji Supermarket." (Compl. at ¶ 55.) The Plaintiff complied with this directive, apparently because of the past threats if he attempted to communicate his concerns to the Defendant Attorney regarding the operations of the Department. (Compl. at ¶ 56.)

### b. Testimony at Corruption Trial

In or about June 2008, the Plaintiff testified on behalf of the Nassau County District Attorney at David Wasserman's corruption trial. In particular, Murray testified that a builder was denied a Certificate of Occupancy by the Department until the builder purchased a table at a political fundraiser for the election of the Town's Supervisor, the Defendant Jon Kaiman. (Compl. at ¶ 60.) After this testimony, the builder called the Plaintiff and offered him money to "gratuitize" him for his testimony, which Murray then reported. (Compl. at ¶ 61.) Ultimately, the jury rendered a not guilty verdict and the Plaintiff's co-employees criticized him for reporting the builder's offer. As a result of this experience, the Plaintiff claims he suffered a mental breakdown. (Compl. at ¶ 63-64.)

### c. Drug Addiction and Rehabilitation

Beginning in or about 2005, the Plaintiff was prescribed Xanax to address certain stress and mental health conditions, allegedly caused by the prior instances of observed misconduct and threats. The Plaintiff became addicted to the drug. In approximately December 2008, the Plaintiff sought treatment for his addiction in an in-patient rehabilitation facility in Florida. (Compl. at ¶ 65-68.) During this time, the Plaintiff took a Family and Medical Leave Act ("FMLA") absence. (Compl. at ¶ 69.)

It is not entirely clear as to when the Plaintiff actually returned to work for the Department. In the Plaintiff's Local Rule 56.1 Statement, he states that he returned from in-patient drug treatment rehabilitation on or about February 3, 2009, and the Defendants do not dispute this date. (Pl. 56.1 at ¶ 37.) In addition, in the

Complaint, the Plaintiff states that he was working on February 13, 2009.

However, in the Plaintiff's motion for summary judgment, he claims that he did not

officially return from FMLA leave until March 16, 2009.

### 2. Protected Speech

The Plaintiff alleges that he engaged in protected First Amendment Activity

on three separate occasions. The exercise of his free speech was allegedly

motivated by the instances of alleged corruption in the Department discussed above

that the Plaintiff claims he observed during his employment.

### a. The Notice of Claim

First, on February 9, 2009, the Plaintiff filed a Notice of Claim pursuant to

New York Municipal Law § 50, which stated

> The Town of North Hempstead has not taken the necessary steps to
> ensure that the Town of North Hempstead Department of
> Buildings and the other Town agencies are free from corruption.
> The Town of North Hempstead and its officers are aware of the
> misconduct of its employees and, despite numerous conversations
> with the Claimant, the Town of North Hempstead has refused to
> take action against, to halt and where appropriate, remove the
> corrupt elements.

(Pl. 56.1 at ¶ 28.) Murray cited claims of intentional infliction of emotional

distress, negligent infliction of emotional distress, as well as violations of New

York Civil Service Law § 75-b and New York Labor Law § 740. A number of the

Defendants had actual knowledge of the Notice of Claim within days of its filing,

including the Defendants Finkel, Kaiman, Taormina, and the Department. (Pl. 56.1

at ¶ 29.) The Plaintiff does not allege that any other Defendant had actual

knowledge of this filing.

### b. The Newsday article

Second, on March 19, 2009, after the Plaintiff was interviewed by a reporter, the Long Island newspaper *Newsday* published a news story in connection with the Plaintiff's filing the Notice of Claim. The article specifically identified Murray and discussed his allegations of corruption. In particular, the article stated:

> Kevin Murray, a plumbing inspector since 2001, alleges in the notice of claim that "retaliatory action" was taken against him and that the town has not taken steps to ensure that the building department and other town agencies "are free from corruption."

(Pl. 56.1 at ¶ 30-31.) Several of the Defendants read or discussed this article when it was published, including the Defendants Finkel, Kaiman, and the Department. The Plaintiff does not allege that any other Defendant read or discussed this article.

### c. New York Municipal Law § 50-h Hearing

Third, on two separate occasions, April 14, 2009 and April 21, 2009, the Plaintiff testified at a New York Municipal Law § 50-a hearing. The Plaintiff spoke on a number of topics regarding the claimed corruption of the Defendants, including (1) the alleged cover-up of safety and health violations at the Mahaji Supermarket (Pl. Ex. K at 85:22-86:3); (2) the selective enforcement of permit requirements (Pl. Ex. K. at 69:17-74); (3) the "shaking down" of contractors by seeking contributions to Defendant Kaiman's political campaign (Pl. Ex. K at 77:24-79:7; at 90-106); and (4) charging fees for permits without Defendant Board approval (Pl. Ex. N at 188:3-189:8.)

Murray's testimony was reviewed by the Defendant Finkel, who then discussed the testimony with the Defendant Kaiman and the Department's

Commissioner Kevin Cronin. The Plaintiff does not allege that any other Defendant was aware of his testimony.

### 3. Allegations of Adverse Employment Actions

The Plaintiff claims that in response to the exercise of his First Amendment rights to freedom of speech, he suffered a number of adverse employment actions at the hands of the Defendants.

#### a. Desk Duty

The first allegation of an adverse employment action took place on February 26, 2009, which was approximately seventeen days after the Plaintiff filed his Notice of Claim and approximately twenty-three days after the Plaintiff physically returned to work from in-patient drug rehabilitation. The Defendant Taormina and the Defendant Department of Finance's Commissioner drafted a letter to the Plaintiff from the Defendant Town. This letter restricted the Plaintiff to desk duty and further informed him that he was required to submit a letter from a "duly licensed New York State physician" attesting that he was able to perform the functions of his job and to operate a Town vehicle. (Pl. 56.1 at ¶ 37-40; Taormina Dep. at 12:20-22.) The Defendant Finkel reviewed this letter before it was mailed to the Plaintiff. The Plaintiff did not receive the letter until March 18, 2009 because it was sent to a previous address. On March 18, 2009, the Plaintiff's physician wrote a note stating that he "had not observed, nor has Murray reported any cognitive or motor difficulties." (Compl. at ¶ 95.) The Town accepted this note as medical clearance to return to the Plaintiff's driving duties. Nevertheless, the

Plaintiff remained restricted to desk duty for approximately two additional weeks. (Compl. at ¶ 96.)

The Plaintiff claims that he was restricted to desk duty and prohibited from conducting field inspections as retaliation for filing the Notice of Claim. On the other hand, the Defendants claim that there were a "combination of things" that kept Murray assigned to desk duty, notably that he "had a lot of administrative issues that he needed to address." (Geraci Dep. at 25:10-18.) Although the Defendants claim that the Plaintiff did not fully address all of the administrative issues, they put him back on full duty on April 3, 2009, to replace another inspector who was going on vacation. (Geraci Dep. at 27:16-28:17.)

### b. Heighted Supervision

In addition to his restriction to desk duty, the Plaintiff alleges that he was subject to heightened supervision after he returned from drug rehabilitation and filed the Notice of Claim. For instance, the Plaintiff's supervisor Geraci kept notes regarding Murray's employment, although he did not do so for the other employees he supervised. However, Geraci maintained that he did so "[b]ecause it became apparent [Murray] was having some difficulties. They were affecting his performance and they were affecting the Building Department as a whole. His job was not being completed, as it needed to be." (Geraci Dep. at 11:5-11.)

As another example of heightened supervision, Geraci relocated the Plaintiff's workstation, although it is disputed precisely when this occurred. Geraci testified that he relocated the Plaintiff's desk so he "could directly supervise him to try to ensure that [the Plaintiff's administrative work] was being done." (Geraci

Dep. at 36:14-23; Def. 56.1 at ¶ 35(b).) On the other hand, the Plaintiff claims that this was an adverse employment action because the new location of his desk restricted his ability to do his job. (Pl. 56.1 at ¶ 85.) In particular, he alleges that he had trouble accessing certain files from this location. (Def. 56.1 at ¶ 35(c).)

Finally, the Plaintiff claims that on an unknown date, he was physically followed by George Kalamaras, a supervisor in the Department, when he was leaving a site inspection, and that this was an adverse employment action. (Pl. 56.1 at ¶ 92.) The Defendants deny this allegation. Although the Plaintiff states that he only observed this one instance of surveillance, he also alleges that Kalamaras told him that the Department was generally "keeping an eye on him." (Pl. Dep. at 65:4-12.)

### c. Threats of Termination and Constructive Discharge

Beyond the reassignment to desk duty and the heightened supervision, the Plaintiff claims that it was the Defendants' objective to terminate his employment. This was made clear to him in late April 2009 when the Defendant Finkel told him that the Defendant Kaiman wanted him "out of here." (Pl. Dep. at 25:23-26:9.) According to the Plaintiff, this threat of termination was another adverse employment action that caused him severe emotional distress.

In addition to the threat of termination, at this time, New York State Civil Service Law § 75 disciplinary charges were being contemplated against the Plaintiff. (Pl. 56.1 at ¶ 98; Cronin Dep. at 57:9-24.) Therefore, the Plaintiff made the choice to resign from his employment with the Defendant Town, which he alleges constituted a constructive discharge. Murray's explanation for this decision

was that he was under the threat of being fired because the Town Attorney Finkel told him that the Town supervisor Kaiman wanted him terminated. (Pl. Dep. at 37:10-16.) However, the Plaintiff also acknowledges that he felt that he had no alternatives because if he did not resign, he would face disciplinary charges and this would be difficult in view of his health problems. (Compl. at ¶ 153-54; Def. 56.1 at ¶ 77.)

### 4. Settlement Agreement

In early June 2009, the Defendant Town's outside counsel was in communication with the Plaintiff's counsel regarding the terms of Murray's resignation.

On June 5, 2009, the Plaintiff was placed on administrative leave with pay pending the Defendant Town Board's approval of a settlement related to the dissolution of his employment. (Def. 56.1 at ¶ 53.) The Plaintiff approved a letter which stated:

> effective Monday June 8, 2009, you are on administrative leave, with pay, pending the Town Board's approval of the settlement related to the termination of your employment with the Town[] in which [sic] the Town agrees to pay you the lump sum of $35,000.00

(Pl. Dep. at 129:2-9.) The Defendant Board ratified the terms of this agreement on June 23, 2009. There is no general release language in the June 5 letter. (Pl. 56.1 at ¶ 24.)

On July 8, 2009, the Defendant Town sent a letter to the Plaintiff's counsel stating:

11

> [c]onsistent with the agreement relating to Mr. Murray's voluntary separation from Town employment, as contained in correspondence dated June 5, 2009 and ratified by the Town Board on June 23, 2009, enclosed please find a check in the amount of $31,747.21.

(Pl. Ex. L.) However, the settlement process broke down and on July 14, 2009, the Plaintiff returned the check to the Defendant Town and demanded that they either continue him on administrative leave with pay or authorize him to return to work. On July 16, 2009, Defendant Finkel responded by informing the Plaintiff that he was no longer employed by the Defendant Town pursuant to the June 5, 2009, agreement.

On or about July 10, 2009, the Plaintiff communicated with his union, the Civil Service Employment Associated ("CSEA") regarding his employment and resignation. The CSEA then filed a demand for arbitration. However, on or about August 3, 2009, CSEA withdrew this demand because of their belief that the issues did not involve a violation of the Collective Bargaining Agreement ("CBA") between the Town and CSEA but rather was a dispute between the Town and Murray. (Compl. at ¶ 147.) The Plaintiff had never otherwise filed a grievance with the CSEA, but he maintains that he was not required to do so under the terms of the CBA.

On August 5, 2009, an agreement was eventually reached between the Defendants and the Plaintiff, which essentially included the terms of the June 5, 2009 agreement, along with provisions for continued health insurance coverage and the Defendants' assurance to not contest the Plaintiff's application for

unemployment. On August 6, 2009, the Town sent a check to the Plaintiff in the amount of $31,747.21, which the Plaintiff accepted.

**B. Procedural Background**

On September 24, 2009, the Plaintiff filed a Complaint against the Town, several municipal agencies, including the Department of Buildings, as well as several individual Town employees. The Complaint contained four causes of action: two for violations of 42 U.S.C. § 1983 and two with regard to the Town's Administrative Code.

On April 5, 2011, in response to a "safe harbor letter" sent by the Defendants, the Plaintiff withdrew his claims against the individually-named Defendants in their official capacities only. In addition, the Plaintiff withdrew his first and second causes of action relating to the Town's Administrative Code.

On April 18, 2011, the Plaintiff filed a motion for summary judgment for the remaining Section 1983 claims. On that same day, the Defendants filed a cross-motion for summary judgment on those same claims. In addition, on May 27, 2011, the Defendants filed a motion for sanctions against the Plaintiff's counsel, pursuant to Rule 11, on the ground that counsel previously negotiated a settlement with the Defendants that encompassed all claims between the parties, and that Plaintiff's counsel made material misrepresentations of fact in the course of the summary judgment process.

## II. DISCUSSION

### A. <u>Legal Standard on a Motion for Summary Judgment</u>

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 202 (2d Cir. 1995) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and <u>Ramseur v. Chase Manhattan Bank</u>, 865 F.2d 460, 465 (2d Cir. 1989)). On cross-motions for summary judgment, the court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. <u>Heublein, Inc. v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993).

Once the moving party has met its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. *Matsushita*, 475 U.S. at 586, 106 S. Ct. 1348. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

### B. As to Whether a Settlement Agreement Was Reached Waiving the Plaintiff's Claims

As an initial matter, the Court will address a portion of the Defendants' motion for summary judgment relating to the possible relinquishment of the Plaintiff's claims. The Defendants assert that the parties have already settled this matter through a payment by the Defendants and that the Plaintiff has thereby waived his right to assert any claims regarding his employment, including the Section 1983 claims presently at issue. On the other hand, Murray contends that this case should not be dismissed because the Plaintiff did not release any claims and that his acceptance of a settlement amount only specifically related to his separation from the Town's employment. Resolution of this issue is essential not only to the Defendants' motion for summary judgment, but also to the Defendants' motion for sanctions, which will later be discussed in further detail.

Both parties do not dispute that they engaged in a settlement negotiation process which took place over several months, ultimately resulting in a payment to

the Plaintiff of a lump sum of approximately $35,000. What is disputed is whether the final settlement agreement merely addressed the separation of Murray from the Town's employment so that he can maintain his federal claims, as the Plaintiff contends, or, whether the agreement was intended to conclude all claims whatsoever relating to the Plaintiff's employment, as the Defendants contend.

In this regard, the Defendants point to a series of emails to demonstrate that while at one point the Town actually considered allowing separate First Amendment claims to stand, it ultimately issued a payment to the Plaintiff only as a resolution of all claims. Most relevant, in a correspondence dated July 31, 2009, the Defendants' attorney rejected a proposal by the Plaintiff's attorney, which included a provision that would allow Murray to retain all of his rights. This July 31 letter went on to state: "The Town's position is simple. Instead of Termination, Mr. Murray accepted this payment in return for his resignation from Town employment. It resolves his separation from Town employment. All relevant terms are contained in the June 5, 2009 letter—which you drafted and upon which you insisted. When the Town approved it as well, the agreement became final." (Pl. Ex. G).

The Plaintiff then responded "This will confirm that the June 5, 2009 letter has been reaffirmed by Mr. Murray. In other words, the June 5, 2009 letter governs the agreement between the Town of North Hempstead and Mr. Murray regarding Mr. Murray's separation from employment with the Town." Thus, according to the Defendants, the final email from the Plaintiff's attorney stating that he accepted the

Town's terms was a clear acceptance that there was a resolution of all of the issues between the claimant and the Town.

In response, the Plaintiff claims that the Defendants cannot identify any document executed by the Plaintiff or any act by the Plaintiff that evidences a clear, unmistakable waiver by the Plaintiff of his present claims. Rather, the Plaintiff argues that the Defendants rely only upon inferences to be drawn from the exchange of emails and letters between the parties' counsel, which is insufficient to establish the existence of a release of the claims asserted in this action, as a matter of law.

Once an individual executes a valid settlement agreement, he cannot subsequently seek both the benefit of the agreement and the opportunity to pursue the claim he agreed to settle. Wilmes v. United States Postal Serv., 810 F.2d 130, 132 (7th Cir. 1987) (quoting, Kirby v. Dole, 736 F.2d 661, 664 (11th Cir. 1984); Melendez v. Horizon Cellular Tel. Co., 841 F. Supp. 687, 691 (E.D. Pa. 1994)). Although the Plaintiff cites to New York law in support of his argument that there was no release of his 42 U.S.C. § 1983 claims, this is incorrect, because "'the question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law.'" Legal Aid Soc. v. City of New York, 114 F. Supp. 2d 204, 226 (S.D.N.Y. 2000) (quoting Brookhart v. Janis, 384 U.S. 1, 4 (1966)); Kreuter v. Reuter, No. 01 Civ. 5229, 2002 WL 31946715, at *5 (E.D.N.Y. Dec. 5, 2002).

The Supreme Court has held, in a number of varying contexts, that a waiver of constitutional rights must be based upon clear and convincing evidence to demonstrate that the waiver is knowing, voluntary, and intelligent. Faretta v.

California, 422 U.S. 806, 835 (1975) (right to counsel); Curtis Publ'g Co. v. Butts, 388 U.S. 130, 145 (1967) (First Amendment rights); see also Doe v. Marsh, 105 F.3d 106, 111 (2d Cir. 1997) (noting that Supreme Court and Second Circuit jurisprudence "suggests that the waiver of a fundamental right in the context of civil cases must be made voluntarily, knowingly and intelligently") (citing United States v. Local 1804-1, 44 F.3d 1091, 1098 n.4 (2d Cir. 1995)). Waiver of federal remedial rights such as an action under 42 U.S.C. § 1983 will not be lightly inferred, and courts "must indulge every reasonable presumption against waiver." Legal Aid Soc., 114 F. Supp. 2d at 226-27; see Fuentes v. Shevin, 407 U.S. 67, 95 n.31 (1972) ("[I]n the civil no less than the criminal area, 'courts indulge every reasonable presumption against waiver.' ") (quoting Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1937)); Williams v. Codd, 459 F. Supp. 804, 816 (S.D.N.Y. 1978) ("In determining whether this settlement precludes the instant action, it must be remembered that the waiver of constitutional rights will not be lightly implied.").

These standards apply to contractual waivers of constitutional rights. In the civil context, "a party waiving constitutionally protected rights—even when doing so through the execution of a contract—must also be made aware of the significance of the waiver." Morris v. N.Y.C. Employees' Retirement Sys., 129 F. Supp. 2d 599, 609 (S.D.N.Y. 2001).

The Court finds that in the present case, the Plaintiff did not unequivocally waive his federal claims voluntarily, knowingly, and intelligently.

First, the Plaintiff testified at his deposition that he was not knowingly aware of any waiver of his rights. He stated "I agreed to this and this alone. Now,

if the Town Board was approving the settlement of something, I'm unaware of, I didn't sign anything. I didn't agree to anything else. Never intended to." (Pl. Dep. at 120). In addition, he testified that "I understood that I had the right to continue with the process of the 50-H hearing through the lawsuit and that I was relinquishing no rights whatsoever." (Pl. Dep. at 120-21). In light of the stringent standard described above necessary to constitute a waiver of constitutional rights, the Court must permit the reasonable presumption against waiver that this testimony infers.

Second, the Defendants cannot point to any actual agreement signed by the Plaintiff that expressly relinquishes his right to bring the present claims. This is not the type of case where an agreement was signed by the Plaintiff that specifically forbids the assertion of any constitutional claims regarding his employment, or relinquishing, releasing, and waiving all possible claims and causes of action against the Town. Cf. Intermor v. Inc. Vill. of Malverne, No. 03 Civ. 5164, 2007 WL 2288065, at *3, *8 (E.D.N.Y. Aug. 8, 2007) (finding that the plaintiff waived all possible claims and causes of action when a waiver agreement was signed by the plaintiff stating that he "freely relinquishes, releases, and waives all possible claims and causes of action against the Village, its successors, assigns, agents, employees, Board of Trustees, and attorneys in their official and individual capacities").

Here, the Plaintiff did accept a payment from the Defendant Town pursuant to the June 5 letter, that stated "effective Monday June 8, 2009, you are on administrative leave, with pay, pending the Town Board's approval of the settlement related to the termination of your employment with the Town in which

[sic] the Town agrees to pay you the lump sum of $35,000.00." According to the Defendants' own correspondence with the Plaintiff, "All relevant terms are contained in the June 5, 2009 letter." (Pl. Ex. G.) The Plaintiff's final acceptance merely confirmed these precise terms. Therefore, the June 5 letter itself contains all the relevant terms and forms the agreement between the parties, and the language contains no expression by the Plaintiff that his acceptance of the $35,000 represents a waiver of his present claims.

In addition, much of the language the Defendants cite to in their correspondence with the Plaintiff's counsel to demonstrate the claimed unequivocal proposal and acceptance of certain settlement terms is ambiguous at best. Statements such as, "I do not know if original game plan will fly. You let the cat out of the bag" and "back to square one", although possibly relating to various bargaining positions taken throughout the negotiation process, certainly do not evince a voluntary, knowing, or intelligent waiver of the Plaintiff's rights. This is further buttressed by the fact that the Defendants at one point did negotiate with the Plaintiff's counsel that the Plaintiff could continue to maintain a separate action for the deprivation of his federal rights.

Although the Defendants' letter on July 31, 2009 does state that the Town rejected the Plaintiff's proposition to maintain his rights, it later goes on to state the Town's position without explicit reference to any waiver of claims. While the Defendants may have intended for the waiver of any subsequent claims to be an explicit condition of Plaintiff's acceptance of payment from the Town, and while it is certainly a reasonable inference from the July 31 letter, it is insufficient to

20

constitute an unequivocal voluntary, knowing, and intelligent waiver of claims under the law.

As the Defendant Finkel's July 16, 2009 letter to the Plaintiff's counsel stated:

> Notably, the June 5, 2009 correspondence, which your client reviewed with you before signing and which was prepared at your insistence, makes no reference to any 'claims' which Mr. Murray may believe he has. It merely addressed the 'termination of his employment with the Town'. His subsequent rejection of a 'global settlement' inclusive of those claims previously raised in his Notice of Claim has no bearing on his separate agreement to voluntarily terminate his employment in return for a payment of $35,000.00.

(Pl. Ex. K.) The Court agrees with this conclusion.

Therefore, the Court finds that the Plaintiff did not knowingly, voluntarily, and intelligently waive his rights to assert the present constitutional claims. Accordingly, the Plaintiff's claims under Section 1983 for violations of his constitutional rights are not barred by the Settlement Agreement.

## C. The Present Motions for Summary Judgment

The Plaintiff and the Defendants have filed cross-motions for summary judgment with regard to the third and fourth causes of action for violations of 42 U.S.C. § 1983, the only two causes of action which now remain. The third cause of action is asserted against the Town, the Department, the Department of Finance, the Attorney Office, Finkel and Taormina. This claim is based upon the alleged retaliation for the exercise of Murray's First Amendment rights of freedom of speech through the adverse employment action of placing Murray on desk duty. The fourth cause of action is asserted against all of the Defendants except the

Department of Finance. This claim is based upon the alleged retaliation of constructive discharge for the exercise of Murray's First Amendment rights of freedom of speech. In sum, Murray bases his Section 1983 claims on the Defendants' alleged retaliation for the exercise of his First Amendment rights.

The Plaintiff asserts that he is entitled to summary judgment on the remaining Section 1983 claims because there are no genuine issues of material fact as to whether (1) the Plaintiff engaged in protected First Amendment activities; (2) the Plaintiff suffered adverse employment actions, including the reassignment to desk duty as well as the alleged constructive discharge; and (3) there was a causal connection between the exercise of Murray's First Amendment rights and the Defendants' alleged retaliatory conduct, so that his speech was a motivating factor in the adverse employment decisions.

The Defendants assert that summary judgment for the Plaintiff is unwarranted. They also contend that they are entitled to summary judgment on these two claims, the third and fourth causes of action for violations of 42 U.S.C. § 1983, in part because: (1) the Plaintiff did not suffer any adverse employment actions; and (2) even if he did, the Plaintiff cannot show a nexus between any protected activity and the claimed adverse employment actions, so that his speech was not a substantial or motivating factor. The Defendants do not appear to contest whether the speech the Plaintiff raises is constitutionally protected.

The Court will consider the cross-motions for summary judgment independently, viewing the facts in a light most favorable to the non-moving party. See Schwabenbauer v. Board of Educ. Of Olean, 667 F.2d 305, 314 (2d Cir. 1981)

("the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."). However, to the extent the motions overlap, the Court will address those issues simultaneously.

**D. Relevant Law**

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." Snider v. Dylag, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). The parties here do not dispute that the Defendants were acting under color of state law. The question presented, therefore, is whether the Defendants' conduct deprived Murray of the rights he asserts under the First Amendment.

The Second Circuit has "described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). Where a plaintiff is a public employee and brings a 42 U.S.C. § 1983 claim based on allegations of retaliation for speech protected by the First Amendment, as in the present case, the three-part test articulated in Johnson v. Ganim, 342 F.3d 105 (2d Cir. 2003) provides the

relevant inquiry. See Martir v. City of New York, No. 07 Civ. 7922, 2009 WL 2191332, at *5 (S.D.N.Y. July 23, 2009).

To establish a prima facie case of First Amendment retaliation, a plaintiff must show that (1) he engaged in constitutionally protected speech because he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor in the decision. Johnson, 342 F.3d at 112. If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the government employer to offer some legitimate, non-retaliatory rationale for its actions. See Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995). In other words, the burden shifts to the defendant "to show that it would have taken exactly the same action absent the improper motive." Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003). If the defendant does so, then the burden then shifts back to the plaintiff to demonstrate by competent evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Patterson v. County of Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004).

### E. Whether the Plaintiff's Speech Relates to a Matter of Public Concern

Speech is on a matter of public concern and therefore a protected activity "if it relates 'to any matter of political, social, or other concern to the community.' " Johnson, 342 F.3d at 112 (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)). In analyzing whether speech addresses a matter of public concern, courts must "focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or

24

whether it had a broader public purpose." Lewis, 165 F.3d at 163-64. However, "the speaker's motive, while one factor that may be considered, is not dispositive as to whether his speech addressed a matter of public concern." Reuland v. Hynes, 460 F.3d 409, 415 (2d Cir. 2006).

Whether or not "'an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record.'" Ruotolo v. City of New York, 514 F.3d 184, 189 (2d Cir. 2008) (quoting Lewis, 165 F.3d at 163). The relevant inquiry is "whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" Ruotolo, 514 F.3d at 189 (quoting Lewis, 165 F.3d at 163-64).

The Plaintiff claims he exercised his right to free speech in three separate contexts, all of which were to address what he perceived to be corruption by the Defendants. First, the Plaintiff asserts that his filing of a Notice of Claim pursuant to N.Y. Municipal Law § 50 on February 9, 2009, was an exercise of his free speech rights. Second, the Plaintiff claims that that the news story published by the Long Island newspaper *Newsday* was also protected as an exercise of his free speech. Third, the Plaintiff asserts that his testimony at the N.Y. Municipal Law § 50-h hearing, again concerning the corruption of safety and health violations by certain Defendants, was protected free speech.

The alleged corruption was observed by Murray during the course of his public employment, and thus arguably was made pursuant to his official duties and not protected. See Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960,

164 L. Ed. 2d 689 (2006) ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). However, the Court finds, as a matter of law, that this speech was not made pursuant to his official duties but rather that of a concerned citizen seeking to bring certain wrongdoing to light. See Rotundo v. Vill. Of Yorkville, No. 09 Civ. 1262, 2011 WL 838892, at *5 (N.D.N.Y. Mar. 4, 2011) ("An employee seeking to bring to light actual or potential wrongdoing or a breach of public trust by public employees or agencies is addressing a matter of public concern."); O'Malley v. N.Y.C. Transit Auth., 829 F. Supp. 50, 53 (E.D.N.Y. 1993) ("There is no doubt that the public would be concerned with the revelation that an official in a position of public trust had previously breached a similar public trust elsewhere in violation of federal law."). Corruption with regard to a municipality's plumbing inspections, a matter which would affect public health and sanitation, is undoubtedly one of serious interest to the community. Cf. Kirby v. Yonkers School Dist. 767 F. Supp. 2d 452, 462 (S.D.N.Y. 2011) (statements that the plaintiff acted in an "unprofessional, insensitive and unacceptable" manner could not be said to be related to issues of serious interest to the community but related only to the plaintiff as a school employee); Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991) (holding that a medical resident's complaints regarding her treatment in residency program did not address matters of public concern).

The speech at issue here is not the type of unprotected speech where workplace complaints are made only to redress personal grievances. Moreover,

even if the speech was partially motivated by personal grievances, "it does not follow that a person motivated by a personal grievance cannot be speaking on a matter of public concern." Storman v. Klein, No. 09 Civ. 4894, 2010 WL 3959817, at *2 (2d Cir. Oct. 12, 2010) (quoting Sousa v. Roque, 578 F.3d 164, 174 (2d Cir. 2009)). Rather, "public corruption or wrongdoing" is almost always a matter of public concern. See Lewis, 165 F.3d at 164; see also Glass v. Dachel, 2 F.3d 733, 741 (7th Cir. 1993) ("[M]atters of public concern do include speech aimed at uncovering wrongdoing or breaches of public trust.").

Therefore, the Court finds, as a matter of law, that the speech at issue here is on matters of public concern and therefore a protected activity.

## F. Whether the Plaintiff Suffered Adverse Employment Actions

"In the First Amendment context . . . plaintiffs need only show that the retaliatory conduct in question 'would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" Nixon v. Blumenthal, 409 Fed. App'x 391, 392 (2d Cir. 2010) (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006)). "Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Frisenda, 775 F. Supp. 2d at 510 (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)). "However, 'lesser actions may also be considered adverse employment actions.'" Id.; see also Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." (citing Bernheim v. Litt, 79 F.3d 318, 324-25 (2d Cir. 1996)). Nevertheless,

for "lesser actions" to constitute an adverse employment action, they "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 207 (2d Cir. 2006) (quoting Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 128 (2d Cir. 2004)) (emphases omitted).

According to the Plaintiff's motion for summary judgment, he suffered four adverse employment actions in retaliation for the exercise of his constitutionally protected activities. The first three all involve changes in the Plaintiff's working conditions. The last claimed adverse employment action concerns his alleged constructive discharge. However, the Court finds that even when viewing the facts in a light most favorable to the Plaintiff, none of the alleged adverse employment actions, individually or collectively, would plausibly deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

### 1. Change in Work Conditions

The first three adverse employment decisions asserted by the Plaintiff involve changes in his working conditions after he returned from twenty-eight days in an in-patient drug rehabilitation facility in Florida in early 2009.

First, the Plaintiff claims that the Defendant Department placed him on desk duty for approximately two weeks and thereby severely modified his previous job responsibility to go out in the field and perform plumbing inspections throughout the community. (Pl. Dep. at 56-57.) Second, the Plaintiff alleges that the Defendant Town relocated his work station from an inspector's cubicle and reassigned him to a different location within the building, and that consequently he

28

was unable to perform his job duties because he had "no access to the file cabinets." (Pl. Dep. at 62.) The Plaintiff also testified that the reason they moved his desk was to place him directly next to his supervisor Joseph Geraci so that Geraci could "keep an eye on [him]". (Pl. Dep. at 59, 75:2-6.) Third, the Plaintiff claims that he was subject to another form of heightened supervision because George Kalamaras, assistant to the Commissioner of the Department, told him that "they want to watch you. They are keeping an eye on you." (Pl. Dep. at 64, 73.) In particular, the Plaintiff claims that on at least one occasion, he was actually followed by Kalamaras during a plumbing inspection. According to the Plaintiff, "Mr. Kalamaras was assigned by [the] Commissioner [of the Department] to follow me in the field. (Pl. Dep. at 64:11-18.)

The Defendants do not dispute that the Plaintiff was placed on desk duty and that his workstation was moved in order to keep a closer eye on him. However, the Defendants deny that the Plaintiff was ever followed by Kalamaras. Regardless, the Defendants contend that none of these events, even if true, would constitute adverse employment actions. Instead, the Defendants argue in both their opposition to the Plaintiff's motion and in their own motion for summary judgment that a change in Murray's work station, five days of being placed on restricted duty, and one incident where Murray alleges he was followed, amount to nothing more than "mere inconvenience[s]" and "alteration[s] of job responsibilities." See Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). The Court agrees.

The Court finds that the Plaintiff has not suffered adverse employment actions with regard to these occurrences, even under the less rigid First Amendment

standard. See Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006) ("In the context of a First Amendment retaliation claim, we have held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action", as opposed to the materially adverse standard).

Retaliatory harassment in the First Amendment context can reach a "critical mass" of frequency and severity as to constitute an adverse employment action. See Hoover v. County of Broome, 340 Fed App'x 708, 710 (2d Cir. 2009) (quoting Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)). "Incidents that are relatively minor and infrequent will not meet the standard, but otherwise minor incidents that occur often and over a long period of time may be actionable if they attain the critical mass of unreasonably inferiority." Phillips, 278 F.3d at 109. While determining whether alleged conduct is adverse "is a heavily fact-specific contextual determination" (Zelnick, 464 at 226), the conduct must be more than de minimis.

First, with regard to the restriction of Murray to desk duty, this action by the Defendants does not qualify as an adverse employment action. Although the Plaintiff was prohibited for a short time from performing part of his employment responsibilities, namely plumbing inspections in the field, he does not deny that the administrative tasks he was restricted to on desk duty were a fundamental and necessary part of his job. See Dotson v. City of Syracuse, No. 04 Civ. 1388, 2009 WL 2176127, at *10 (N.D.N.Y. July 21, 2009) (finding that the plaintiff's preference for desk duty in lieu of road duty did not constitute an adverse

employment action in the Title VII context). Cf. Treglia, 313 F.3d at 717-18, 720

(holding that a police officer who was removed from enforcement duties and

confined to desk duty as a result of receiving previously unassigned administrative

work, among other actions, had established an adverse employment action).

Restricting an employee from going out in the field for a limited period of time, in

order to complete required paperwork, does not constitute an adverse employment

action. This mandate from an employer would not deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights.

Second, with regard to a change in the Plaintiff's work station when he was

relocated from his inspector's cubicle to a desk on the other side of the building,

this could only reasonably be viewed as making his job more logistically difficult.

See Lorenzo v. St. Luke's Roosevelt Hosp. Ctr., No. 09 Civ. 2277, 2011 WL

4047444, at *2 (E.D.N.Y. Sept. 8, 2011) (move to a different office, away from

filing cabinets with relevant records, made a plaintiff's job more logistically

difficult but that it "constitutes a mere inconvenience not actionable" under

materially adverse standard). This is akin to a move to a smaller office, which has

been characterized as "a mere inconvenience" not constituting an adverse

employment action within the meaning of relevant First Amendment retaliation

case law. See Hepburn v. City of Torrington, No. 03 Civ. 1242, 2004 WL 1771590,

at *5 (D. Conn. Aug. 4, 2004); St. Ledger v. Area Co-op. Educ. Servs., 228 F.

Supp. 2d 66, 74 (D. Conn. 2002) (no adverse employment actions when as a result

of a transfer, the plaintiff was given a dirty and old desk, a non-functioning

computer, no private, office, no filing cabinet, and no computer); see also Mark v.

31

Mt. Sinai Hospital, 85 F. Supp. 2d 252, 257 (S.D.N.Y. 2000) (no constructive discharge where psychologist employed by hospital was deprived of a personal office and had to wheel a portable filing cabinet with her patient records from office to office every day, absent evidence that she was unable to secure a private room to meet with patients or that portable filing cabinet compromised security of confidential patient records).

Moreover, the Plaintiff's testimony with regard to this condition was expressed as an adverse action largely because of the heightened supervision it entailed by being placed in a desk immediately next to his supervisor. Notwithstanding this context, the action would still not be found, as a matter of law, to constitute an adverse employment action. See Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 981, at 392–93 (S.D.N.Y. 2011) (finding that six-weeks of isolated and excessive supervision of plaintiff relating to his work on a project does not constitute an adverse employment action); Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) ("Courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions."). Cf. Temple v. City of New York, No. 06 Civ. 2162, 2010 WL 3824116, at *6 (E.D.N.Y. Sept. 23, 2010) (finding that the plaintiff's allegations of excessive monitoring were insufficient to present a triable claim that she was subjected to a discriminatorily hostile environment) ; Finkelshteyn v. Staten Island Univ. Hosp., 687 F. Supp. 2d 66, 83 (E.D.N.Y. 2009) ("based on Finkelshteyn's absences, his attendance was scrutinized more so than others, that fact alone is not indicative of impermissible discrimination").

Finally, with regard to the heightened supervision and surveillance, even if assumed to be true, the facts as alleged here would not, as a matter of law, constitute adverse employment actions. In general, excessive or heightened scrutiny of an employee has been held by courts to be insufficient to constitute an adverse employment action. See generally Mendez v. Starwood Hotels & Resorts Worldwide, Inc., 746 F. Supp. 2d 575, 597 (S.D.N.Y. 2010) ("surveillance[, even through a hidden camera] can never be deemed an adverse employment action"); Dotson v. City of Syracuse, No. 04 Civ. 1388, 2009 WL 2176127, at *18 (N.D.N.Y. July 21, 2009) ("The law in this circuit . . . is clear that an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action" under a materially adverse standard); Constance v. Pepsi Bottling Co. of N.Y., No. 03 Civ. 5009, 2007 WL 2460688, at *36 n.15 (E.D.N.Y. Aug. 24, 2007) (expressing doubt that "surveillance on the job" would constitute an adverse employment action); Meder v. City of New York, No. 05 Civ. 919, 2007 WL 1231626, at *4 (E.D.N.Y. Apr. 27, 2007) (finding "excessive scrutiny" does not constitute adverse employment action in ADEA context); Scott v. Cellco P'ship, No. Civ. 7245, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007) ("As to plaintiff's assertions of 'defendant's general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny of plaintiff' . . . the Court concludes that those allegations, if true, do not constitute adverse employment actions as now defined in Burlington" in the Title VII context). "An employer has a right to monitor, and correct when necessary, its employees'

shortcomings in performing their jobs." Raia v. Illinois Tool Works, Inc., No. 04 Civ. 3535, 2011 WL 3471504, at *11 (E.D.N.Y. Aug. 5, 2011).

Even when viewing the facts in a light most favorable to the Plaintiff, this case does not present any particularly egregious allegations that would lead the Court to stray from this general consensus. If the Defendants were keeping a close eye on the Plaintiff in the course of his duties, which in this case necessarily would involve following him to site inspections, this does not, as a matter of law, constitute an adverse employment action. The Defendants' actions may have constituted overzealous supervisory actions but none created an "unreasonably inferior and adverse" work environment in the First Amendment retaliation context. See Russo, 341 F. Supp. 2d 85. Rather, the Defendants' supervisory behavior are actions that are at most characterized as "treating [the Plaintiff] like a baby", which the Plaintiff has himself acknowledged. (Pl. Dep. at 76.) In addition, Murray fails to allege how these actions disrupted or rendered his work environment to be inferior.

In particular circumstances, other courts have noted that surveillance on the job can constitute an adverse employment action. See Constance, 2007 WL 2460688, at *36 n.15 ("Related to this concern is whether surveillance on the job constitutes an adverse employment action . . . it is questionable under the facts of this case whether the use of the investigator 'affect[s] employment or alter[s] the conditions of the workplace.' "). However, under the facts of this case, in which the Plaintiff alleges that he was followed on a site inspection on one occasion, and that he was later told by this person that his employer wanted him to keep an eye on

him, it is not the type of conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.

In sum, the minor events described above do not, as a matter of law, constitute adverse employment actions. While the precedent in this Circuit allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass, no such "critical mass" exists here. As found recently by the Second Circuit in the Title VII retaliation context, "[i]ndividually the actions were trivial, and placed in context they remain trivial. Taken in the aggregate, the actions still did not adversely affect [the plaintiff] in any material way. 'Zero plus zero is zero.'" Tepperwien v. Entergy Nuclear Operations, --- F.3d ---, No. 10 Civ. 1425, 2011 WL 5142555 (2d Cir. Oct. 31, 2011) (quoting MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc., 138 F.3d 33, 38 (2d Cir.1998)).

As in Tepperwein, the Plaintiff suffered several minor incidents, such as restrictions to certain administrative tasks for a limited period of time and the relocation of his workstation. However, as in Tepperwein, these allegations are insufficient, even in light of the entire context of this case. The Plaintiff points out, and the Court is fully aware, that the relevant standard in the First Amendment retaliation context is not "materially adverse", as in the Title VII retaliation context, but rather, "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Zelnick v. Fashion Inst. of Tech., 464 F.3d 217, 227 (2d Cir. 2006). Nevertheless, the same rationale of Tepperwein is applicable and the Court now finds that somewhat trivial

incidents such as those alleged here cannot, as a matter of law, suffice to constitute retaliation.

Therefore, the Plaintiff's summary judgment motion alleging these actions as adverse employment actions is denied.

### 2. **Constructive Discharge**

Other than the minor incidents described above, the Plaintiff's only other allegations of retaliatory conduct are that he was threatened with termination and consequently "constructively discharged." The evidence in support of these allegations is the Plaintiff's own testimony that he was told by the Defendant Finkel, who was in turn told by Defendant Jon Kaiman, the Town's Supervisor, that he was going to be fired for attendance issues. Specifically, Finkel told the Plaintiff that "Jon [Kaiman] wants you out of here. We are going to move to fire you." (Pl. Dep. at 26.) The Plaintiff had the understanding that if he did not resign, that the Defendant Town was going to terminate his employment. The Plaintiff also testified at his deposition that he felt that he had no alternative because he was "under the threat of termination which meant that [he] had to go through a civil service procedure" and that he "needed for [his] health to accept the severance pay and get out of there." (Pl. Dep. at 36.) The Plaintiff's attorney began negotiations with the Town almost immediately after this alleged threat over the mechanism as to how Murray would be separated from Town employment. Approximately one week after Finkel's statement, he signed a letter terminating his position. (Pl. Dep. at 28.)

While the facts themselves in this regard are largely undisputed, the Defendants adamantly deny that the Plaintiff was constructively discharged. According to the Defendants, Murray's separation from employment was the result of a month-long negotiation between the Plaintiff's counsel, the Town Attorney, and the Town's outside counsel. On August 6, 2009, the Defendant Town sent a check in the amount of $31,727,21 to the Plaintiff, consistent with the June 2009 Agreement. The Defendants point to the transmittal letter for the check, which stated that the check was being issued in connection with Murray's "voluntary separation" from Town employment. (Def. Opp. at 9.) Thus, the Defendants argue that whether or not the terms of the parties' correspondence establishes a release of claims, the Plaintiff left the Town's employment of his own volition.

As an initial matter, threats of termination cannot, by themselves, constitute an adverse employment action. See Brightman v. Prison Health Serv., Inc., No. 05 Civ. 3820, 2007 WL 1029031, at *7 n. 4 (S.D.N.Y. Mar. 30, 2007); see also Massie v. Ikon Office Solutions, Inc., 381 F. Supp. 2d 91, 99 (N.D.N.Y. 2005) (where plaintiff had received numerous warnings his "fear of being terminated [was] not an adverse employment action because of its lack of consequence"). Nevertheless, threats of termination can be of the utmost importance when alleged in the context of a constructive discharge claim. This is because "[a] triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired." Rupert v. City of Rochester, Dep't of Env. Servs., 701 F. Supp. 2d 430, 440 (W.D.N.Y. 2010); Grey v. City of Norwalk Bd. of Educ., 304 F. Supp. 2d 314, 324 (D. Conn. 2004) ("threats of

termination alone are sometimes sufficient to show constructive discharge.");
Valdes v. New York City Dep't of Env. Protection, No. 95 Civ. 10407, 1997 WL
666279, at *3 (S.D.N.Y. Oct. 27, 1997) ("an employer's clearly expressed desire
that an employee resign has been held sufficient to find a constructive discharge");
Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188-89 (2d Cir. 1983) (citing Welch
v. Univ. of Tex., 659 F.2d 531, 533-34 (5th Cir.1981)) ("finding constructive
discharge where employer clearly expressed his desire that employee resign
because such statement would force a reasonable person to resign"). See also
Porter v. City of Manchester, 151 N.H. 30, 42, 849 A.2d 103, 117 (2004) (holding a
combination of veiled threats of termination and physical intimidation was
"sufficient to prove the elements of a constructive discharge claim.").

The relevant determination then is whether there is a genuine issue of
material fact as to whether the Plaintiff's separation from the Town's employment
was a constructive discharge constituting an adverse employment action.

"A constructive discharge . . . occurs when an employer deliberately makes
an employee's working conditions so intolerable that the employee is forced into an
involuntary resignation." Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d
Cir. 1993). "[A] constructive discharge cannot be proven merely by evidence that
an employee . . . preferred not to continue working for that employer. Nor is the
test merely whether the employee's working conditions were difficult or
unpleasant." Id. "[A] claim of constructive discharge must be dismissed as a
matter of law unless the evidence is sufficient to permit a rational trier of fact to
infer that the employer deliberately created working conditions that were so

difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Stetson v. NYNEX Service Co., 995 F.2d 355, 361 (2d Cir. 1993).

The Court finds that, contrary to the Plaintiff's contention, as a matter of law, there was no constructive discharge. Although threats of termination alone have occasionally been held to be sufficient to permit a rational trier of fact to find that a reasonable person in the employee's shoes would have felt compelled to resign, those cases involved a direct and/or repeated threats from the employer, along with some other adverse conduct. See, e.g., Valdes v. New York City Dep't of Env. Protection, No. 95 Civ. 10407, 1997 WL 666279, at *3 (S.D.N.Y. Oct. 27, 1997) (finding a triable issue of fact as to whether constructive discharge occurred because the plaintiff's supervisors told him on multiple occasions "do[you] want to keep [your] job", that they would "make [his] life miserable, that "it was best if [he] resigned" because he "was going to be terminated"); Grey v. City of Norwalk Bd. of Educ., 304 F. Supp. 2d 314, 324 (D. Conn. 2004) (variety of circumstances made her situation "intolerable," including: the repeated threat that her position would be eliminated; a rumored letter announcing her termination; petty reprimands; and suggestion that the District buyback her contract and his subsequent comment that she should consider herself "finished.").

Moreover, many cases support the finding that threats of termination cannot lead to a constructive discharge, even when combined with more egregious conduct not alleged here. See, e.g., Spence, 995 F.2d at 1156 (no constructive discharge where plaintiff "was ridiculed by his supervisor, blamed for not knowing about

certain changes in company practice of which no one had notified him, harangued by executives, written up and criticized for poor performance, threatened with termination, placed on probation, and suffered high blood pressure as a result of his supervisor's treatment."); Katz v. Beth Israel Med. Ctr., No. 95 Civ. 7183, 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) (no constructive discharge where employee was "routinely" berated by her supervisors, criticized unfairly, given insufficient staff assistance, told to resign if dissatisfied, "and at least once threatened with termination"); see also Kincheloe v. Caudle, No. 09 CA 10, 2009 WL 3381047, at*16 (W.D. Tex. 2009) ("verbal threats of termination and criticism have been held not to rise to the level of an adverse employment action.").

In the present case, Murray relies solely on a statement from the Town Attorney Finkel, not his direct employer, who told him that his supervisor wanted him terminated. Of course, "this is not to say that a direct threat from someone with firing authority is always necessary to support a claim of constructive discharge based on the threat of termination." Lindner v. New York City Bd. of Educ., No. 01-Civ-8245, 2005 WL 1801648, at *5 (E.D.N.Y. July 28, 2005). However, the Plaintiff has offered no evidence that his employer was using Finkel to send the Plaintiff a message about his future employment with the Town. This evidence is simply not sufficient to permit a rational trier of fact to find that the Defendant employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in Murray's position would have felt compelled to resign.

While the Plaintiff cites to two cases, one of which is from this Court, for the proposition that an employee with the choice of being fired or resign establishes a constructive discharge as a matter of law, this is a mischaracterization of the holdings in these cases. In Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987), the plaintiff's supervisor placed him on a 90-day probationary period and was told he would be fired at the end of the period regardless of his performance. The Second Circuit found that there was a genuine issue of fact because he was told directly by his supervisor that he would be fired no matter what he did to improve his allegedly deficient performance. Accord McCalla v. SUNY Downstate Med. Ctr., No. 03-CV-2633, 2006 WL 1662635, at *5 (E.D.N.Y. June 8, 2006) (denying motion to dismiss Title VII retaliation claim, finding that plaintiff sufficiently alleged that he was forced to resign where, among other things, he allegedly was "informed when he arrived at his [disciplinary] hearing regarding allegations of professional misconduct that he would be fired no matter what happened" (internal quotation marks omitted)). In Cioffi v. New York Community Bank, 465 F. Supp. 2d 202, 209 (E.D.N.Y. 2006) (Spatt, J.), this Court held that when the Plaintiff's supervisor engaged in a pattern of baseless criticism, told her she would not "be around", and warned her she would be fired if she did not meet certain ambiguous behavior objectives, among other things, there was enough for a reasonable jury to determine that she was constructively discharged. As opposed to both of those cases, the Plaintiff here merely heard a rumor from someone outside the Department that his supervisor wanted to terminate him. Thus, as opposed to Lopez and Cioffi, Murray's employer did not clearly express a desire for Murray to

resign. Cf. Welch v. Univ. of Tex. & Its Marine Science Inst., 659 F.2d 531, 533-34 (5th Cir. 1981) (finding constructive discharge where employer clearly expressed his desire that employee resign because such a statement would force a reasonable person to resign).

Moreover, the Plaintiff contends that he had no alternatives because if he did not resign, he would face disciplinary charges and this would be difficult on his health. However, "when an employee resigns rather than responds to disciplinary charges, the resignation cannot later be construed as a constructive discharge." Bailey v. New York City Bd. of Educ., 536 F. Supp. 2d 259, 266 (E.D.N.Y. 2007). Cf. Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004) (reversing district court finding that threat of disciplinary proceedings and concomitant thirty-day suspension without pay, could not, as a matter of law, constitute an adverse employment action).

Finally, the Court notes that the availability of alternatives to resignation, such as complaint procedures, may preclude a finding of constructive discharge. See Spence, 996 F.2d 1147; Silverman v. City of New York, 216 F. Supp. 2d at 116 ("the fact that [plaintiff] could have sought a hearing before being terminated eviscerates his claim that threats of termination created an 'intolerable' situation which left him with but one choice: resignation"); Katz v. Beth Israel Med. Ctr., No. 95 Civ. 7183, 2001 WL 11064, *13 (S.D.N.Y.2001) (no constructive discharge where employee voluntarily resigned after at least one threat of termination instead of filing grievance pursuant to collective bargaining agreement); Stembridge, 88 F. Supp. 2d at 284-85 (no constructive discharge where employee failed to avail

himself of right to appear with counsel at informal conference to challenge suspension without pay; "in light of the fair hearing and opportunity to be heard before an independent arbiter, a rational jury could not plausibly find that a reasonable person in plaintiff's situation would have felt compelled to resign").

In the present case, the Plaintiff did ask his union, the CSEA, to file a demand for arbitration, but this request was withdrawn when CSEA learned of the settlement between the Town and the Plaintiff. The Plaintiff allowed CSEA to withdraw the grievance and did not appeal the withdrawal. According to the Defendants, the Plaintiff therefore did not pursue the grievance and arbitration procedures in accordance with his rights under the CBA and this eviscerates his constructive discharge claim. In response, the Plaintiff argues that submitting Section 1983 claims to the CBA grievance procedures is a "waste of resources" and "would undermine that statute's efficacy in protecting federal rights." (Pl. Opp. at 17 (citing McDonald v. City of West Branch, Mich., 466 US 284, 290 (1984).) In addition, the Plaintiff points to a letter from the CSEA that informed the parties that in its judgment, the Defendants' acts were "not a violation of the [CBA]."

The Court finds that there are insufficient facts to allege constructive discharge on the part of the Defendants. Therefore, the Court need not address whether Murray's failure to pursue grievances procedures under his union's collective bargaining agreement would prevent him from pursuing a constructive discharge claim.

Therefore, the Court finds that the Plaintiff has failed to demonstrate that he suffered any adverse employment actions.

43

## G. **Whether A Causal Connection Exists Between the Exercise of the Plaintiff's Rights and the Defendants' Conduct**

Assuming, arguendo, that the Plaintiff has established that no genuine issues of material fact exist as to whether he suffered adverse employment actions, the issue remains as to whether or not the Defendants actually retaliated against Murray for exercising his First Amendment rights to free speech. A causal connection between the speech and adverse action must exist "so that it can be said that [the] speech was a motivating factor in the determination." Morris, 196 F.3d at 110. A causal connection between the protected speech and the adverse employment action can be established "either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Id. The plaintiff may also rely on the temporal proximity of the protected action and the adverse employment action. See Donovan, 547 F. Supp. 2d at 218 (citing Woods v. Enlarged City Sch. Dist., 473 F. Supp. 2d 498 (S.D.N.Y. 2007); Raniola v. Police Commissioner William Bratton, 243 F.3d 610, 626 (2d Cir. 2001)). In determining the existence of a causal connection between the protected speech and the alleged retaliatory action, the Court is mindful that "[c]ausation generally is a question for the finder of fact." DePace, 183 F. Supp. 2d at 638.

### 1. **Circumstantial Evidence and Temporal Proximity**

The Plaintiff points to certain pieces of circumstantial evidence to demonstrate an inference of a causal connection; one that the Plaintiff claims is so strong that there remains no genuine issue of material fact with regard to whether a

causal connection exists. At its core, the Plaintiff's argument is that (1) the Defendants' behavior toward him changed; and that (2) this change of behavior was in close temporal proximity to the exercise of his free speech.

First, the Plaintiff states that he was never disciplined prior to the exercise of his free speech. Second, the Plaintiff states that after he exercised his free speech rights, he was placed on desk duty; had his workstation relocated; was followed on at least one inspection; and was threatened with termination. Murray argues that the "reasonable and rational inference to be drawn from the different treatment by the Defendant [Department] against the Plaintiff before and after the exercise of his free speech rights, is that there is a causal connection between the Plaintiff's exercise of free speech and the Defendants' conduct." (Pl. Mem. at 18.) Finally, the Plaintiff claims that his protected speech occurred beginning February 9, 2009, the date he filed his Notice of Claim, through June 5, 2009, the date of his resignation. Thus, the Plaintiff contends that the time period between the first exercise of his free speech rights and his resignation was less than four months and this further evidences a causal connection.

Theoretically, temporal proximity can be a sufficient basis from which to infer a causal connection as a matter of law. See Gaetano & Assocs. Inc. v. N.L.R.B., 183 Fed App'x 17, 20 (2d Cir. 2006); NLRB v. Am. Geri-Care, Inc., 697 F.2d 56, 60 (2d Cir. 1982) (holding that an inference of anti-union animus is "proper when the timing of the employer's actions is 'stunningly obvious'"); NLRB v. Porta Sys. Corp., 625 F.2d 399, 404 (2d Cir. 1980) (noting that the "abruptness of a discharge and its timing are persuasive evidence as to motivation"). Although the

Court agrees that the temporal proximity at issue here is close, the Court does not find the period of four months to be the type of "stunningly obvious" timing that would result in the finding of a causal connection as a matter of law. See, e.g., Gaetano & Assocs. Inc., 183 Fed App'x at 20 (temporal proximity found when massive lay-offs took place on the same day the employer was notified of the employees intent to unionize). Cf. Hollander v. American Cyanamid Co., 895 F.2d 80, 85–86 (2d Cir. 1990) (three and a half months insufficient); McDowell v. N. Shore–Long Island Jewish Health Sys.,788 F. Supp. 2d 78, 83 (E.D.N.Y. 2011) ("pursuant to the Second Circuit's authority, the Court finds that [a] greater than three month gap, unsupported by any other allegations showing plausible retaliation, is insufficient to raise an inference of retaliation"); Meggison v. Paychex, Inc., 679 F. Supp. 2d 379, 388 (W.D.N.Y. 2010) (period of four months insufficient).

Moreover, even if the Court considers the two and a half month period between the Newsday article published on March 19, 2009, and the Plaintiff's resignation, the Court is not convinced that this would establish, as a matter of law, that a causal connection exists. This is especially true when the only other circumstantial evidence the Plaintiff can point to is a change in behavior. See Caskey v. County of Ontario, ——F. Supp. 2d ——, 2011 WL 3319533 (W.D.N.Y. Aug. 2, 2011) ("The nine-month temporal proximity between plaintiff's protected activity and the allegedly unlawful discrimination—standing, as it does, alone—is insufficient as a matter of law to suggest a causal connection for purposes of plaintiff's retaliation claim").

Finally, the Plaintiff maintains that Murray was a union employee subject to a contractual system of progressive discipline prior to the filing of disciplinary charges under New York Civil Service Law § 75. The Plaintiff argues that the "Defendants leapfrogging its progressive discipline system obligation alone is sufficient to establish the Plaintiff's prima facie case of adverse employment action in the context of a claim of retaliation. (Pl. Rep. at 6 (citing Foss v. Coca Cola Entrs., Inc., 2011 WL 1303346 at *9 (E.D.N.Y. Mar. 31, 2011) (internal quotation marks and citations omitted) (holding "Departures from procedural regularity can create an inference of discriminatory intent, sufficient to establish a prima facie case. Thus, for example, if a defendant's own progressive discipline policies recommend using counseling before taking adverse action, the failure to follow those policies may be circumstantial evidence supporting an inference of discrimination.).)

However, the CBA at issue here does not contain the contractual progressive discipline system referred to by the Plaintiff. Instead, it is a disciplinary review process that occurs once the Town has elected to file a disciplinary notice or impose disciplinary action. The CBA does not require the Town to warn a Plaintiff or hold formal counseling sessions. Rather, it requires only that if the Town wished to terminate the Plaintiff, it would have had to serve a five day notice of its intention, so that the Union could demand arbitration on the Plaintiff's behalf. As the Defendants did not file formal disciplinary charges prior to the Plaintiff's resignation, this argument is without merit and thus does not provide any evidence supporting an inference of retaliation.

47

Therefore, the Plaintiff has failed to sufficiently allege a causal connection between the protected speech and any adverse employment actions.

## 2. Defendants' Purported Non-Discriminatory Reasons for its Conduct

Even assuming that the Plaintiff has presumptively established a causal correlation, once the Defendants have presented a non-retaliatory reason for its employment actions, they are entitled to summary judgment "unless the Plaintiff can point to evidence that reasonably supports a finding of prohibited [retaliation]." James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000). "Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred." Scott v. Coughlin, 344 F.3d 282, 287-88 (2d Cir. 2003).

Viewing the facts in a light most favorable to the Plaintiff, the Defendants are nevertheless entitled to summary judgment on this ground and the Plaintiff's motion for summary judgment necessarily fails, because the Defendants have provided several legitimate, non-retaliatory reasons for its alleged adverse acts, which the Plaintiff has not adequately refuted as mere pretext. See Milano v. Astrue, No. 05 Civ. 6527, 2008 WL 4410131, at *27 (S.D.N.Y. Sept. 26, 2008).

First, the Defendants contend that the reason the Plaintiff was restricted to desk duty was to allow the Plaintiff to catch up on the administrative paperwork that had gotten backlogged since his FMLA leave. (Geraci Dep. at 27:11) ("The only way he could [do the reports] was to be in the office, sort out the inspection reports . . . try to clean up all of the paperwork that was around. The only way for

him to do that was to stay in the office."). The Plaintiff does not deny that these tasks were a necessary part of his job responsibilities, and therefore the Court finds this to be a legitimate non-retaliatory reason for the restriction to desk duty.

As for the heightened supervision, both by relocating Murray's desk to be situated next to Geraci and through actual surveillance by Kalamaras, and the alleged constructive discharge, the evidence put forth by the Defendants demonstrates that these actions were solely motivated and justified by Murray's poor work performance and attendance problems. (See Geraci Dep. at 3) ("we were not having a lot of success with [the Plaintiff], in terms of getting him to perform his duties on a whole. He still had administrative tasks that he had to complete. I asked him to move over there, so I could directly supervise him to try to ensure that this was being done.").

With regard to his attendance problems, the Plaintiff himself admitted in his deposition that he could not state how many days he was tardy or out of the office upon his return from FMLA leave, but that "it could have been thirty" or even more than forty. (Pl. Dep. at 42-43.) Murray's persistent attendance issues were further demonstrated by records maintained by Murray's supervisor, Joseph Geraci. (Pl. Ex. T.) Moreover, Murray's work performance and attendance issues were discussed repeatedly by Geraci with him. (Def. Opp. at 15.) Geraci held three meetings with the Plaintiff in 2008 to address the Plaintiff's attendance, organization, and filing paperwork, which were designed to "increase awareness, gain compliance and train the employee." (Geraci Dep. at 28, 30, 36.) These meetings were both formal and informal discussions. (Pl. 56.1 at ¶ 72-73.) The

Plaintiff never received formal discipline, but he did receive a Counseling Memorandum dated August 22, 2008 for failing to comply with the Department's rules and procedures. (Pl. 56.1 ¶ 74-77.) This memorandum, issued before any protected speech occurred, demonstrates that Murray had failed to comply with certain job requirements and that his "compliance [was] sporadic at best." (Pl. Ex. U.)

Therefore, the Court finds that the Defendants' actions zealously supervising Murray and contemplating disciplinary action are not inherently retaliatory, particularly in light of the strong evidence of Murray's poor performance prior to his partaking in any protected activity. (See Def. 56.1 at ¶ 39) (the Plaintiff not disputing that he was going to be receiving a disciplinary notice a year before his filing the Notice of Claim); (Geraci Dep. at 37:3-9, 39:9-13.) This evidence is more than sufficient to establish a legitimate, non-retaliatory reason for any adverse actions taken against the Plaintiff. The facts here raise a strong inference that Murray was not terminated for retaliatory reasons—an inference which Murray has not overcome by the production of contrary evidence.

The Plaintiff has not pointed to any evidence that his absenteeism or poor work performance was a mere pretext for the heightened supervision or alleged constructive discharge. For example, the Plaintiff has not refuted his poor work and attendance record. Although the Plaintiff contends that he was on FMLA leave until March 16, 2009 (Pl. Mem. at 15), so that his performance in early 2009 is irrelevant, the Plaintiff has simultaneously stated that he returned to work in February 2009 and does not dispute that he was physically present at work

throughout a number of days in February and early March. Even if there is a question of fact as to whether the Plaintiff was on FMLA leave during the period of January -March 2009, there is no dispute that the Plaintiff's job performance was a viable issue prior to 2009. Moreover, even if the Court were to consider March 16, 2009 as the beginning date at which the Plaintiff's lateness or absence from work could be considered as a reason for his alleged constructive discharge, the Defendants have demonstrated that the Plaintiff's consistently poor attendance, time and performance record did not improve after this date. The Plaintiff has marshaled no evidence to support the view that the Defendants' dissatisfaction with the Plaintiff's performance was a mere pretext to cloak unwarranted retaliation.

Accordingly, because the Plaintiff has not set forth any adverse employment actions or causal connection to the exercise of his First Amendment speech, and because he cannot adequately refute the Defendants' reasons for their actions as mere pretext, the Defendants' motion for summary judgment dismissing the Plaintiff's Section 1983 causes of action is granted.

**H. As to Sanctions**

The Defendants have moved for sanctions against the Plaintiff's attorney, Austin R. Graff, Esq., pursuant to Rule 11, asserting that: (1) the statements and claims asserted in the Plaintiff's filings were frivolous and without merit; and (2) the complaint should have been withdrawn after the Settlement Agreement was signed.

Rule 11 (b) of the Federal Rules of Civil Procedure states that an attorney who presents "a pleading, written motion, or other paper" to the court thereby "certifies" that to the best of his knowledge, information, and belief formed after a

reasonable inquiry, the filing is: (1) not presented for any improper purpose, "such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation"; (2) "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law"; and (3) either supported by evidence or "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery". Fed. R. Civ. P. 11(b).

In general, "the standard for triggering the award of fees under Rule 11 is objective unreasonableness." Margo v. Weiss, 213 F.3d 55, 65 (2d Cir. 2000). This "standard is appropriate in circumstances where the lawyer whose submission is challenged by motion has the opportunity, afforded by the 'safe harbor' provision, to correct or withdraw the challenged submission." In re Pennie & Edmonds LLP, 323 F.3d 86, 90 (2d Cir. 2003). The Second Circuit has cautioned that Rule 11 sanctions should be "made with restraint", Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 333 (2d Cir. 1999), and, even where a court determines that Rule 11(b) has been violated, the decision whether to impose sanctions is not mandatory, but rather is a matter for the court's discretion, Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004).

As an initial matter, the Defendant's contention that sanctions are warranted relies on the presumption that the Settlement or June 5 letter effectuated a release of the Plaintiff's claims. A review of the Agreement however, as set forth more fully above, does not support this presumption. The agreement did not explicitly provide that the Plaintiff agreed to release and discharge any and all causes of action which the Plaintiff may have had, arising out of his employment with the Town. In

52

addition, the Plaintiff's deposition testimony indicates that he did not knowingly waive any of his federal claims. Accordingly, the Court finds that the Plaintiff did not release all of his claims asserted in the complaint when he agreed to terms of the Settlement and accepted a check from the Defendants in the amount of $35,000. The Court finds that there was a legal and factual basis to assert those claims in the instant action. Therefore, the Court denies the Defendants' motion for Rule 11 Sanctions against the Plaintiff on this ground.

Second, as to the alleged material misrepresentations of fact and frivolous arguments, the Defendants point to certain language and several propositions in the Plaintiff's filings that they deem patently false and without evidentiary support. It may be that certain arguments of the Plaintiff are unconvincing or have weak evidentiary support. However, the Court finds that the Complaint, as well as the Plaintiff's other filings with this Court, are sufficiently grounded in a factual and legal basis so that sanctions in that regard are therefore not warranted. The Court is persuaded that Murray's counsel conducted "a reasonable pre-filing inquiry into the evidentiary and factual support for the claim[s], and certif[ied] that the legal arguments are supported by existing law, and therefore that they are not frivolous." Capital Bridge Co., Ltd. V. IVL Techs. Ltd, No. 04 Civ. 4002, 2007 WL 3168327, at *10 (S.D.N.Y. Oct. 26, 2007). Nothing here advanced by the Plaintiff's counsel rises to the level of the extraordinary circumstances so as to warrant Rule 11 sanctions. See Park v. Seoul Broadcasting Sys. Co., No. 05 Civ. 8956, 2008 WL 619034, at *1 (S.D.N.Y. Mar. 6, 2008) ("Courts have cautioned litigants that Rule 11 sanctions are reserved for extraordinary circumstances.") (citation omitted).

Accordingly, the Defendants' motion for Rule 11 sanctions against Austin R. Graff, Esq. is denied.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Plaintiff's Motion for Summary Judgment on the Section 1983 causes of action is denied; and it is further

**ORDERED** that the Defendants' Motion for Summary Judgment dismissing the complaint in its entirety is granted; and it is further

**ORDERED** that the Defendants' Motion for Rule 11 Sanctions is denied; and it is further

**ORDERED** that the Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
January 6, 2011

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge